IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARTHA L. S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 19-cv-253-DGW[2] |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB and SSI in December 2014, alleging a disability onset date of September 15, 2014. After holding an evidentiary hearing, an ALJ denied the application on November 22, 2017. (Tr. 17-31). The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 11, 15.

Plaintiff raises the following issues:

1.     The ALJ's analysis of the opinion evidence is legally insufficient, and his decision to rely on the state agency doctor's opinion and discount plaintiff's treating provider's opinions, was not supported by substantial evidence.

2.     The ALJ's residual functional capacity (RFC) assessment is not supported by substantial evidence.

3.     The ALJ's analysis of plaintiff's subjective symptoms is legally insufficient.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes[3].   Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

---

[3]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However,

while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since September 15, 2014, and she was insured for DIB only through December 31, 2016. The ALJ found that plaintiff had severe impairments of COPD, obesity, degenerative joint disease, degenerative disc disease, and microvascular dysfunction.[4]

The ALJ found that plaintiff had the RFC to do light work, but she could occasionally lift/carry 25 pounds, and frequently lift/carry 20 pounds. She should avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gases, and poor ventilation.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. However, she was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

---

[4] "Small vessel disease is a condition in which the walls of the small arteries in the heart are damaged. The condition causes signs and symptoms of heart disease, such as chest pain (angina). Small vessel disease is sometimes called coronary microvascular disease or small vessel heart disease."     https://www.mayoclinic.org/diseases-conditions/small-vessel-disease/symptoms-causes /syc-20352117, visited on October 29, 2019.

4

formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

### 1.   Agency Forms

Plaintiff originally alleged that she became disabled as of September 1, 2011. In June 2017, she changed her alleged onset date to February 15, 2014.   (Tr. 231).

Plaintiff was born in 1963 and was about to turn 54 years old on the date of the ALJ's decision.   (Tr. 232).   She said she was disabled because of COPD, chronic bronchitis, psoriasis on the hands and feet, arthritis, GERD, depression, and a heart condition.   She was 5' 9" tall and weighed 215 pounds.   She stopped working in September 2011.   (Tr. 236).   She had worked in the past as a cook in a fast food restaurant and a factory line worker.   (Tr. 265).

### 2.   Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing in July 2017.   (Tr. 41).

Plaintiff testified that she was 5' 8" tall and weighed about 200 pounds.   Her weight went up and down, sometimes going up or down 30 to 40 pounds.   She lived with her husband, adult son, and two grandchildren, ages 3 and 4.   (Tr. 45-48, 61).

Plaintiff said she could not work because of breathing problems from COPD and emphysema, back problems, and psoriasis on her hands and feet.   (Tr. 55). She got ultraviolet light treatments for psoriasis.   She used inhalers for COPD, which helped "a lot," but it was hard for her to be outside in very hot weather.   (Tr. 56).

When the psoriasis on her hands flared up, it was itchy and made it difficult to grip things. It usually ran its course. Her UV therapy appointments were usually at 8:10 in the morning. (Tr. 62-63). Her back started hurting if she stood for 45 minutes to an hour. Her knees were "fine." She was able to walk to church, which was 7 or 8 blocks, but had to go slowly. She had chest pain if she was stressed. She could sit comfortably through a one-hour TV show. She did not drive because her license was revoked, and she had "stare seizures." She took medicine, which helped. (Tr. 59, 65-68).

A vocational expert (VE) also testified. The VE testified that a person with plaintiff's RFC assessment could not do plaintiff's past work, but she could do other jobs such as sales attendant, cashier, or hand packager. (Tr. 73).

### 3. Relevant Medical Records

#### a) REA Clinic

Plaintiff received primary health care at REA Clinic. The transcript contains records from February 2014 through July 2017. (Tr. 396-438, 877-894, 1739-1765, 1857-1934, 2245-2253). She was seen there by both Michelle Jenkins, M.D., and by Physician's Assistant Marilyn Starkey, as well as other providers.

In July 2014, she complained of left knee pain for the last month. Exam showed mild tenderness to palpation with adequate range of motion. (Tr. 401-404). She had previous arthroscopic surgery of the left knee. MRI findings included an undersurface/flap tear of the medical meniscal body; diminished size of the lateral meniscus related to prior partial meniscectomy and or degenerative type

tear; and moderate sized joint effusion.   (Tr. 812-813).

In February 2015, plaintiff complained of generalized joint pain.   Exam showed minimal joint swelling and mild pain with movements of the joints in the hands.   (Tr. 887-888).   Labwork for autoimmune disease was negative.   (Tr. 891).   She was to try stopping a statin drug that she was taking for high cholesterol to see if that helped.   (Tr. 885).   In May 2015, she was prescribed Wellbutrin for help with quitting smoking.   (Tr. 879).   She was hospitalized for chest pain in late May 2015.   A stress test was negative.   (Tr. 877).

In September 2015, plaintiff's lungs were clear to auscultation with no wheezes, rales, or rhonchi.   (Tr. 1762).   She was seen for an annual physical the next month.   She denied shortness of breath.   (Tr. 1758-1759).

In March 2016, she was seen for bruising to her forearm and an injury to her finger resulting from an altercation with her daughter-in-law.   She denied chest pain.   (Tr. 1748-1749).

PA Starkey saw plaintiff for a check-up in August 2016.   She said she had been diagnosed with COPD by Dr. Pineda.   She denied chest pain.   She was taking Ranexa.[5] On exam, her lungs were clear with diminished breath sounds. Her heart had regular rate and rhythm with no murmurs, rubs or gallops and normal S1 and S2.   Musculoskeletal exam was normal.   Her spine was nontender to palpation. There was no swelling in the extremities.   (Tr. 1738-1739).

Plaintiff saw PA Starkey to get a referral to a neurologist in October 2016 because she recently had a partial seizure without loss of consciousness.   Plaintiff

---

[5] Ranexa "is used to treat chronic angina (chest pain). It works by improving blood flow to help the heart work more efficiently."   https://www.drugs.com/ranexa.html, visited on October 29, 2019.

denied chest pain, fatigue, headache, and back problems. Physical exam was normal. Her lungs were clear and showed good air movement. She was referred to neurologist Tiffany Ward. (Tr. 1869-1870).

Plaintiff followed up with PA Starkey in January 2017 for a fall she had on Christmas Eve. X-rays were within normal limits except for degenerative changes in the cervical spine. Physical exam was normal. Her back was nontender. The next month, she had been to the emergency room for a cough. She was told her COPD was aggravated. She was given medication and was feeling better. She was taking Keppra prescribed by her neurologist and had no recent seizures. Physical exam was normal. There was good air movement in the lungs. Her spine was nontender. She had normal motor strength in the upper and lower extremities. (Tr. 1857-1862).

In May 2017, both Dr. Jenkins and PA Starkey signed off on a form entitled Medical Source Statement of Ability to Do Work-Related Activities. They indicated that plaintiff could occasionally lift and carry up to 20 pounds. She could sit, stand, and walk for 1 hour without interruption, and could sit and stand/walk for only 1 hour out total out of a work day. She could only occasionally reach, handle, feel, and push/pull. She could only occasionally operate foot controls. She could never climb ladders or scaffolds, kneel, crouch, or crawl, and she could only occasionally climb stairs and ramps, balance and stoop. She could never be exposed to extreme temperatures or pulmonary irritants. She was able to do a list of activities such as walk a block at a reasonable pace on rough or uneven surfaces and climb a few steps at a reasonable pace with the use of a hand rail. The form

asked them in several places to identify medical findings to support the limitations they assigned. They answered only as to the list of activities. They wrote that she had a "documented hx of COPD & joint pain. She is able to ambulate to office visits [without] assistive devices or assistance. States she is able to complete the above activities." (Tr. 2225-2230).

In July 2017, plaintiff complained to PA Starkey of pain in the left lumbar area and hip. Her pain did not radiate. A CT scan showed degenerative disc disease and facet arthropathy in the lumbar spine. On exam, she had tenderness to palpation in the left lumbar area and hip. She was referred to physical therapy. (Tr. 2248-2250).

### b) Prairie Cardiovascular Consultants

Plaintiff was treated here for her cardiac issues. She was usually seen by PA Nathaniel Clark, supervised by Dr. Son Phong Le. In August 2015, PA Clark noted that she had recurrent atypical chest pain. Cardiac catherization showed no sign of atherosclerotic disease. She had "sluggish blood flow through the left anterior descending artery." This was thought to represent microvascular disease. She also had chronic angina for which she had previously been prescribed Ranexa. She complained of chest discomfort lasting from 1 to 2 minutes up to 5 minutes. She had COPD and was on Symbicort. She complained of shortness of breath but denied joint pain. The diagnoses were hyperlipidemia, benign hypertension, and unspecified chest pain. PA Clark prescribed a different blood pressure medication and increased the dosage of Ranexa. He advised her to stop smoking and to exercise. (Tr. 1069-1071).

In February 2016, a CT angiogram showed that the major coronaries were normal.   (Tr. 1063).

Plaintiff was hospitalized overnight in February 2016 because of an episode of chest pain.   Based on the negative CT angiogram and the negative stress test in May 2015, the consultant concluded that her symptoms were non-cardiac and recommended that she stop taking Ranexa.   (Tr. 1057-1060).

Plaintiff was seen by PA Clark in March 2016.   She said that she had an increase in chest pain since stopping Ranexa.   She said she had two types of pain: a sharp stabbing sensation that comes and goes at random and a heaviness and pressure sensation that occurred when she was stressed or overexerted herself. The second type was improved with Ranexa, so that drug was restarted.   There was no evidence of artery disease or ischemia.   (Tr. 1053-1055).

In March 2017, plaintiff reported to PA Clark that she was "doing extremely well."   She had stopped smoking.   She denied any chest pains.   As long as she took Ranexa, she was "completely symptom free."   (Tr. 2232).

c)      **Dr. Raymund Pineda**

Dr. Pineda is a pulmonologist who treated plaintiff's COPD.

In June 2016, a pulmonary function study showed moderate obstruction with significant improvement in FEV1 with bronchodilators.   The results were consistent with GOLD stage 2 COPD with a reversible component.[6]   There had been a significant decrease in FEV1 and a decrease in FVC since the previous study

---

[6] GOLD refers to the Global Initiative for Chronic Obstructive Lung Disease system for assessing the severity of COPD.   There are four stages for persons with airflow obstruction: mild, moderate, severe, and very severe.   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4524525/, visited on October 30, 2019.

from May 2014.   (Tr. 1402-1403).

In July 2016, Dr. Pineda noted that plaintiff was trying to quit smoking.   On exam, her lungs were clear to auscultation and percussion was normal.   She had no chest wall tenderness or cough.   Respiratory effort was normal.   He advised her to continue with Symbicort, 2 puffs in the morning and 2 puffs at bedtime, and to start 1 inhalation of Incruse Ellipta at noon.   She was told to stop smoking. She was to return in 6 months or earlier if needed.   (Tr. 1396-1400).

There are no further records from Dr. Pineda.

**d)** **Southern Illinois Dermatology**

Plaintiff was treated here for psoriasis on her hands and feet.   She was treated with UVB light therapy and Dermasorb, a prescription corticosteroid cream.   From June through December 2015, she had UVB treatment twice a week. She then cut back to once a week because of her husband's schedule.   (Tr. 1790-1818).

In January 2016, plaintiff said she had 75% improvement with the UV treatment.   (Tr. 1788).   She was switched to a different cream in January 2016 because she said the topical steroid was making her worse.   She continued to have UVB treatments once a week.   (Tr. 1786).   In July 2016, UVB treatments to the hands were discontinued unless she had a flare.   She was to continue treatments to the feet once per week.   (Tr. 1769).   In December 2016, she had an outbreak on her hands.   She had missed two weeks of UVB treatments.   She was to have UVB treatments twice a week.   (Tr. 1941-1942).   In February 2017, plaintiff had not been consistent in showing up for UVB treatments.   Plaintiff said she had

improved but then she "flared." She was to come to the office once a week for treatments. (Tr. 1935-1936).

### e) Consultative Physical Exam

At the request of the agency, Dr. Adrian Feinerman examined plaintiff in April 2015. The exam was normal except for decreased breath sounds. Her lungs were clear with no wheezes, rales, or rhonchi and no increase in AP diameter. Range of motion of the cervical and lumbar spine and both knees was full. Plaintiff had no difficulty in tandem walking, standing on toes and heels, squatting and arising, arising from a chair, or ambulating. Fine and gross manipulation were normal. She complained of left knee pain. (Tr. 595-604).

### f) Ability Evaluation – Rehab Unlimited

An Ability Evaluation was done on Dr. Jenkins' referral in July 2015. Plaintiff said she was disabled because of shortness of breath and joint pain of the hands and fingers related to a skin condition. Her functional status included no limitation in walking or stairs. Her gait was normal. She was able to lift 26 pounds and carry 21 pounds for 80 feet with a limiting factor of shortness of breath. She was able to squat and to walk 240 feet with beginning of shortness of breath. She was able to walk up and down a 4-step device 4 times with a stated limiting factor of shortness of breath. (Tr. 970-971).

### 4. State Agency Consultant's Opinion

LaVerne Barnes, D.O., assessed plaintiff's RFC based on a review of the file in October 2015. She concluded that plaintiff was capable of occasionally lifting and carrying 25 pounds and frequently lifting and carrying 20 pounds. She could sit

for 6 hours a day and stand/walk for 6 hours a day.   She should avoid extreme cold temperatures, humidity, and pulmonary irritants because of her COPD.   Dr. Barnes discussed some of the medical records in her report.   (Tr. 110, 112-114).

## Analysis

Plaintiff first argues that the ALJ erred in accepting the state agency consultant's opinion instead of the opinion offered by Dr. Jenkins and PA Starkey.

Dr. Jenkins and PA Starkey treated plaintiff, but the ALJ was not required to fully credit their opinion because of that status; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).   A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's application was filed before March 27, 2017.   The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it

13

applying the factors set forth in § 404.1527(c)(1)-(6).   Supportability and consistency are two important factors to be considered in weighing medical opinions.   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

Here, the ALJ explained that he gave little weight to the treaters' opinion because (1) it was "conclusory," the product of a pre-printed form, and "provided no explanation of the objective evidence relied on in forming that opinion;" and (2) the treatment records did not contain significant clinical or laboratory findings to support the opinion.   In fact, the ALJ pointed out, the treatment records demonstrate "the opposite."   (Tr. 298).

The ALJ discussed the medical records in detail at Tr. 23-28.   Plaintiff does not argue that his discussion was inaccurate or that he overlooked relevant medical evidence.   The ALJ's discussion illustrates that the treatment records, including those of REA Clinic, do not support the treaters' opinion.   For example, he pointed out that plaintiff's physical exams were frequently normal and there were "only a handful of intermittent abnormal findings" related to her back and knees.

Plaintiff's argument ignores much of the ALJ's discussion.   She argues that the ALJ was wrong to reject the opinion because it was expressed on a pre-printed form.   However, that argument distorts the ALJ's explanation.   He did not reject the opinion because it was given on a form; he rejected it because it was given on a

form *and* the form as completed did not cite the evidence that the treaters' relied on for their opinions. Although the form asked the treaters to "identify the particular medical or clinical findings" which support their opinions, they did not do so. With no citation to medical or clinical findings, the ALJ was left with only checkmarks on a preprinted form, not the most persuasive evidence especially as the opinions expressed on the form are contradicted by the treaters' own notes.

Plaintiff also suggests that the ALJ had a duty to ask the treaters for clarification of what evidence they relied on. She cites *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) for that proposition. However, *Barnett* cited to a previous version of § 404.1527(c). The version of § 404.1527(c) in effect at the time of the ALJ's decision did not contain the language cited by the Court in *Barnett*. Further, the problem here is not just that the treaters failed to identify the evidence that they relied on. As the ALJ pointed out, the treaters' own notes affirmatively contradict their opinions. Plaintiff makes the related argument that the ALJ failed to identify what clinical or laboratory findings would have supported the opinion. That is a specious argument. The obvious answer is, something other than the many normal physical examinations documented in the treaters' notes.

The ALJ accepted the state agency consultant's opinion because she reviewed medical evidence from a number of sources, and she cited evidence from the record in support of her opinion. Plaintiff faults the ALJ for not explaining why the evidence supported her opinion. Again, that argument is specious. Unlike the treaters, Dr. Barnes explained in detail the evidence she relied on and the ALJ

adequately discussed the medical evidence that post-dated Dr. Barnes' opinion.

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ easily met the minimal articulation standard here.

In plaintiff's second point she argues that the ALJ did not adequately explain how obesity impacted her other impairments and failed to account for the effects of psoriasis, including absenteeism caused by UVB treatments.

Obesity is not, itself, a listed impairment, but the agency has recognized that "Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems." SSR 02-1p, 2000 WL 628049, *3. Of course, this does not mean that an obese person will necessarily have other impairments or is disabled. However, the ALJ is required to consider and explain the effects of obesity. "As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." SSR 02-1p, 2000 WL 628049, *7.

The ALJ found that obesity was a severe impairment and cited SSR 02-1p. He explained that plaintiff's obesity placed additional pressure on her spine and exacerbated her heart condition. (Tr. 22). Plaintiff argues that he should have also found that obesity impacted her left knee condition such that she is unable to do the walking and standing required by light work. However, she cites to nothing in the medical record to substantiate this argument. As the ALJ noted, there was little

mention of knee problems in the medical records. Further, plaintiff testified that her knees were fine.

Plaintiff's argument about absenteeism fails because it assumes that plaintiff would miss a whole day of work every time she had to go to the doctor for a UVB treatment and that her appointments could not have been scheduled around her work schedule. Further, she cites to no medical evidence suggesting that she was limited to only occasional handling because of psoriasis.

Lastly, plaintiff challenges the ALJ's finding that her subjective complaints were not supported by the record. She nitpicks at the ALJ's analysis while ignoring the meat of the ALJ's reasoning, which is that plaintiff's subjective claims are inconsistent with the rest of the evidence. See, Tr. 23, 29.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1.

SR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.*, at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the

witness.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."  *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

As required by § 404.1529 and SSR 16-3p, the ALJ considered the objective medical evidence; the course of treatment; the findings of the various doctors on physical exams; plaintiff's own statements to her treating doctors; her daily activities; and the medical opinions.  Plaintiff has not identified any error in the ALJ's analysis.[7]  The ALJ's conclusion as to the accuracy of plaintiff's statements was supported by the evidence and was not "patently wrong;" it must therefore be upheld.  *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence.  She has not identified a sufficient reason to overturn the ALJ's conclusion.  Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence.  *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

---

[7] Plaintiff cites to district court decisions in this section of her brief.  See, Doc. 22, pp. 16-17. District court decisions are not authoritative precedent.  *Van Straaten v. Shell Oil*, 678 F.3d 486, 490 (7th Cir. 2012).

**Conclusion**

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   November 5, 2019.**

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**